**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| Civil Action No. 1:19-cv-01067 | ) |
| | ) |
| STACEY WRIGHT, | ) |
| a Colorado resident, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| PORTERCARE ADVENTIST HEALTH | ) |
| SYSTEM, a Colorado nonprofit corporation, | ) |
| d/b/a CENTURA HEALTH — | ) |
| CASTLE ROCK ADVENTIST HOSPITAL, | ) |
| | ) |
| Defendant. | ) |

_____

**COMPLAINT AND JURY DEMAND**
_____

Plaintiff, Stacey Wright ("Ms. Wright"), through counsel, states the following as her Complaint and Jury Demand ("Complaint") against Defendant, Portercare Adventist Health System, d/b/a Centura Health —Castle Rock Adventist Hospital ("Centura").

**SUMMARY OF THE ACTION**

This is a sex discrimination and retaliation case. From June 9, 2013 to January 22, 2018, Ms. Wright worked as a Registered Nurse in the Cardiac Catheterization Laboratory ("Cath Lab") at Centura. Ms. Wright's work was exemplary. For the first four years, she received uniformly "Above Expectation" reviews, never received a complaint or warning, and received numerous award and recognitions for the quality of her work and the contributions she made to the Cath Lab.

In October 2017, however, this changed.  Julie Lombard was named the Cath Lab Manager. Almost immediately, she began treating Ms. Wright less favorably than the male employees in the

Cath Lab.  In addition, as part of her declared mission to "clean house," Ms. Lombard continually attacked Ms. Wright, and blamed her for incidents that were not her responsibility, to create a supposed basis for firing her.

In November 2017, Ms. Wright made a call to Centura's "Integrity Hotline" regarding this mistreatment. She stated that she felt targeted and she asked for an investigation into her current treatment by management. Ms. Wright also met with a Human Resources Representative, Jodi Parrish. Ms. Parrish agreed with Ms. Wright that she was being treated unfairly, and that she was being held to a different level of expectation and responsibility than her male colleagues.

Because of her discriminatory treatment, on December 19, 2017, Ms. Wright applied for, interviewed, and received a verbal offer to transfer to another Centura position at a different hospital: the Parker Adventist Hospital. On December 20, 2017, Ms. Wright notified her supervisors and HR that she intended to accept the offer, and to transfer to another Centura hospital. The following day, Ms. Wright was informed (falsely) that she was ineligible to transfer because a written warning concerning her performance and behavior was "in the works." A week after she informed Centura of her intent to transfer, Centura violated its progressive discipline policy and issued Ms. Wright a final written warning.

On January 8, 2018, Frank Archuleta officially replaced Ms. Lombard as the Cath Lab Manager. He continued Ms. Lombard's practice of harassing and discriminating against Ms. Wright.  On January 22. 2018, Centura fired Ms. Wright.

## PARTIES

1.      Ms. Wright is a Colorado resident. Ms. Wright was employed continuously by Centura as a nurse in the Castle Rock Adventist Hospital Cath Lab from June 9, 2013, to January

22, 2018 (except for a brief three-month period from October 23, 2015, to January 19, 2016, when she left Centura for personal reasons unrelated to this lawsuit).

2.      Defendant, Portercare Adventist Health System, d/b/a Centura Health —Castle Rock Adventist Hospital (referred to in this Complaint as Centura), is a Colorado nonprofit corporation with its principal place of business in Centennial, Colorado. Centura owns and operates the Castle Rock Adventist Hospital.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 because it arises under the laws of the United States. (*See* Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*)

4.      This action is timely because Ms. Wright was discharged by Centura on January 22, 2018, and Ms. Wright filed charges of sexual discrimination and retaliation with the EEOC on June 14, 2018, less than 300 calendar days after the discrimination and retaliation.

5.      This action is also timely because the EEOC issued its Notice of Right to Sue letter to Ms. Wright on March 21, 2019, and this action has been filed within ninety days of that date.

6.      Venue in Title VII cases is determined by 42 U.S.C. § 2000e–5(f)(3), *see Pierce v. Shorty Small's of Branson Inc.*, 137 F.3d 1190, 1191 (10th Cir. 1998). Venue is proper in this judicial district under 42 U.S.C. § 2000e–5(f)(3) because the unlawful employment practices are alleged to have been committed in this district; and because the aggrieved person, Ms. Wright, worked, and would have continued to work for Centura in this district but for its unlawful employment practice.

## FACTUAL ALLEGATIONS

7.      Ms. Wright incorporates by reference paragraphs 1 through 6 as if fully set forth in these factual allegations.

8.      Ms. Wright began working for Centura as a Registered Nurse in the Cath Lab at Castle Rock Adventist Hospital on or about June 9, 2013.

9.      In the fall of 2013, Ms. Wright became the charge nurse for the Cath Lab.

10.     Ms. Wright was the only female employee in the Cath Lab for much of the time she worked in the Cath Lab.

11.     For the following four years, Ms. Wright received stellar ratings. She was always rated either "Exceeds Expectations" or "Meets Expectations" on the reviews she was given by her supervisors.

12.     In addition, no disciplinary actions were ever taken against her, and she received no complaints or warnings.

13.     Ms. Wright also received numerous awards and recognitions from Centura.

   a.   During the First Quarter 2014-2015, she was named the " 'Connectivity
        Winner' for the Core Competency Award" at the Castle Rock hospital. The
        nominating letter stated:

        Stacey continually demonstrates and challenges the definition of
        connectivity within the organization. Stacey's personal and handshake
        approach has opened doors while simultaneously opened channels of
        communication that not only benefit our department but live into our
        mission statement.  I have received numerous compliments as well as letters
        from patients expressing their gratitude for Stacey and the care she provides.
        I don't believe there is an associate in this facility who doesn't know her
        name.  Her continued effort and level of connectivity have and will continue
        to raise the level of care in this facility. At the end of the day, Stacey is a
        shining example of connectivity both within the hospital and within the

EMS community.  For these and many other reasons, please consider Stacey Wright for this Core Competency Award.

b.   In February 2015, Ms. Wright was awarded a "Good Catch Award."

c.   For Ms. Wright's 2015 Fiscal Year End Performance Evaluation by Direct Manager Russell Royer, all areas of her "Performance Goals" were evaluated as "Exceeds Expectations" or "Meets Expectations."

d.   On July 17, 2017, she received a "WOW!" recognition for her work as the charge nurse of the Cath Lab. The recognition stated:  "It is really great how you have stepped up and taken control of the charging aspects of the Cath / IR Lab. Thank you so much for helping us to stay ahead of this new challenge.  Keep up the GREAT work!!

e.   On August 25, 2017, Ms. Wright received a Great Job recognition from the CFO of Centura. It stated: "Stacey: Thank you so much for the leadership you have exhibited within the department.  I really appreciate how you have stepped up to help lead the department in a positive direction. Thanks for all you do."

f.   On October 26, 2017, Ms. Wright was awarded the prestigious CRISSIE Honors. CRISSIE is the acronym for "Centura Core Values and Standards of Behavior - Compassion, Respect, Integrity, Stewardship, Spirituality, Imagination, Excellence." The CRISSIE Award is given to the hospital employee who most exemplifies those core values.

14.     In October 2017, Centura announced the hiring of Julie Lombard as the Cath Lab Manager and Suzanne Parker as the Director of the Cath Lab.  Neither individual had any experience in cardiology, and neither position was filled through a formal hiring process.

15.     On October 26, 2017, Ms. Parker, the new Cath Lab Director, wrote about Ms. Wright:  "Since I have become a member of the Cath lab team, Stacey has been a rock! She displays a positive attitude, seeks to create seamless care for our patients by bridging the gap between areas such as cath lab, IR, Preop and PACU.  She has been a font [sic] of information and support to me and the entire cath lab team. Thank you Stacey!"

16.     After Ms. Parker and Ms. Lombard became, respectively, the Director and the Manager of the Cath Lab, problems began to develop in the Lab. On November 21, 2017, a patient was brought into the Hospital's Emergency Room by Castle Rock EMS as a Cardiac Alert. The patient was not brought emergently to the Cath Lab despite experiencing Acute Coronary Syndrome.

17.     The patient subsequently expired.

18.     Castle Rock EMS was dissatisfied with the Hospital's handling of the patient. The EMS said they would not deliver cardiac emergency patients to the Hospital, a process that is known as "Divert."

19.     On November 23 2017, the Cath Lab staff was called in for a cardiac emergency. In caring for the patient, the staff performed inadequately, making a series of errors. The Cardiologist, Dr. Kaufman, elected to send the patient to another Hospital. The doctor placed the Cath Lab department on divert/advisement until further notice.

20.     These were the first time the Cath Lab department had been placed on diversion in the four years it had been open.

21.     When Ms. Lombard became the Manager of the Cath Lab, she declared it was her mission to "clean house" at the Cath Lab. Over the next two months, Ms. Lombard subjected Ms. Wright to pervasive discrimination and harassment.

22.     For example, on November 7, 2017, Ms. Wright was verbally criticized (and she was later criticized in the final written warning) for not completing "Bleeding Risk Scores," "ACS Dashboard," and "EP Dashboard." These items were not, and had never been, Ms. Wright's responsibility during her time working at Castle Rock.

23.     Ms. Wright was also criticized and cited in the final written warning for not helping transition Bleeding Risk Scores," "ACS Dashboard," and "EP Dashboard" to Ms. Lombard.  In truth, however, Ms. Lombard did not ask for help until late December, and when Ms. Wright was asked to provide help, she did so. On December 18, 2017, Ms. Wright spent more than thirty minutes showing Ms. Lombard how to obtain Bleeding Risk Scores.

24.     When Ms. Wright showed Ms. Lombard how to extract Bleeding Risk Scores, she responded that she already knew how to do this. Ms. Lombard stated that she assumed that Ms. Wright knew a way to extract all data from charts instead of viewing each chart individually. Ms. Wright did not have such knowledge.

25.     When Ms. Lombard became the Manager of the Cath Lab, she informed Ms. Wright that Ms. Lombard would be assuming the duties of the charge nurse (which Ms. Wright had been performing). As a result, Ms. Wright, on two separate occasions, told Ms. Lombard that she would "step down" from charge nurse duties, which she did on December 11, 2017. Nonetheless, Ms.

Wright was criticized in the final written warning for not continuing to perform the charge nurse duties after that time.

26.     Ms. Wright ceased clocking in as the charge nurse on December 12, 2017. Subsequently, in an attempt to make it appear that Ms. Wright continued to be the charge nurse, a management level employee altered her time card so that it appeared that she continued clocking in as the charge nurse.

27.     All charge nurse punches after December 11, 2017, were altered and added without her authorization.

28.     Although Centura altered Ms. Wright's time records, it did not adjust the pay to reflect the higher pay of a charge nurse. Thus, after December 11, 2017, Ms. Wright did not receive the "charge time" pay differential for her work.

29.     Further, Ms. Parker, Ms. Lombard, and Ms. Parrish knew or should have known, that the time sheets had been doctored after Ms. Wright had submitted them. A Manager or Director at the Hospital could have determined easily which codes (such as the charge nurse code) were entered on the time clock with the employee punch, and which were manually entered later by someone who had specific access to the time cards.

30.     Indeed, the alteration of Ms. Wright's time cards after December 11, 2017 was likely done, or authorized by Ms. Parker, Ms. Lombard, or Ms. Parrish. At the December 27, 2017 meeting, the three of them discussed changing Ms. Wright's time card to reflect the charge nurse differential, and Ms. Parker stated that she was going to "go back and amend the [time records] report." Ms. Wright objected to such a change, and stated that she did not authorize any change.

31.     Ms. Wright was accused in the final written warning of "insubordination, lack of respect, unresponsiveness, ineffective communication and negative attitude." These subjective, negative assertions were false, inconsistent with and contrary to the accolade written by Ms. Parker less than two months earlier, inconsistent with the CRISSIE Award given to Ms. Wright on October 26, 2017, and contrary to the many positive actions taken by Ms. Wright for the good of the Cath Lab.

32.     For example, on November 13, 2017, a doctor, Dr. Cinthia Bateman, threatened to put the entire lab on divert unless Ms. Wright came in and showed her how to use the x-ray. Even though Ms. Wright was not on call, she accommodated the Doctor's demand and came in (even though she had to bring her child with her). When she arrived, the problem had been resolved.

33.     Additionally, on numerous occasions, Ms. Lombard asked Ms. Wright for help, and she gave the needed help.

34.     On November 28, 2017, at 6:44 a.m., a text was sent to Ms. Wright asking for a Cardiologist's telephone number so she could coordinate case times. Coordinating case times was a responsibility of the charge nurse, and Ms. Wright was performing those duties as soon as she was able.

35.     Because Ms. Wright was driving to work, she did not see the text until eleven minutes later, at 6:55 a.m. She immediately went to the manager, who indicated that everything was resolved (the cardiologist telephone numbers were in the control room, and in the possession of all of the Cath Lab staff). Nonetheless, on December 1, 2017, Ms. Wright was called into the office by Ms. Lombard and Ms. Parker and criticized for not responding to the text message until eleven minutes after it was sent.

36.    It was common practice in the Lab for employees to occasionally run personal errands at slow times during the work day.  After the change in leadership, however, Ms. Wright was attacked (and eventually given a written warning) for running a personal errand (in lieu of taking a lunch break), while male employees continued to do so and were not disciplined. (This practice was confirmed by the Human Resources Director, Jodi Parrish, who spoke with the previous Cath Lab Director, Clint Watson).

37.    The day Ms. Wright ran a personal errand, the Cath Lab had zero cases scheduled.

38.    Ms. Parker told Ms. Wright that she was the only member of the Cath Lab who ever notified Ms. Parker or Ms. Lombard that she was going somewhere to run an errand. Ms. Parker confirm that Ms. Wright always provided notice, while the male staff in the department never said anything.

39.    Ms. Wright asked, "Do you think this lack of notice is because the male staff members don't run personal errands, or because they don't notify you when they run personal errands?" Ms. Parker said she knew that male staff members ran errands but did not give notice when they did so.

40.    For instance, just one week before Ms. Wright ran her errand, Frank Przymus, another full time employee in the Lab, left for two and a half hours in the middle of one of the department's busiest days without suffering any adverse consequences or reprimands from Ms. Lombard or Ms. Parker.

41.    Ms. Wright was also singled out and constantly blamed for shirking certain duties assigned to all the employees in the Cath Lab or assigned to other employees.

42.     On December 12, 2017, Ms. Lombard sent a text asking **all** the Cath Lab employees to help in the PACU department. Ms. Wright checked in with the PACU to find out when help was needed (not until the afternoon). Ms. Wright checked with the PACU several times to see if they needed help, and then spent the entire afternoon there providing support. Despite this, she was cited by her supervisors for insubordination and not following directions.

43.     On information and belief, none of the male employees provided support. None of the male employees were cited for not providing support.

44.     Ms. Wright was reprimanded for not conducting an orientation for new traveler staff on December 18, 2017. Orientation for traveler staff was not a part of Ms. Wright's regular job responsibilities.

45.     Further, another employee, Ryan Voegle had already been instructed by Ms. Lombard and Ms. Parker to perform the orientation on that date. In fact, Mr. Voegle sent a notice the previous week to Ms. Wright and her co-workers explaining that he will be doing the orientation.

46.     All the employees in the department could have performed the orientation. Ms. Wright was the only one who was reprimanded even though neither Ms. Lombard nor Ms. Parker requested that Ms. Wright perform the task.

47.     Because of the discrimination and harassment directed toward her, in November 2017, Ms. Wright called Centura's "Integrity Hotline" regarding the mistreatment of her.

48.     Ms. Wright stated in her call to the Integrity Hotline that she felt targeted and she asked for an investigation into her current treatment by management. On information and belief, no investigation was performed as a result of her call to the Integrity Hotline.

49.     Ms. Wright also met with a Human Resources Representative, Jodi Parrish, on several occasions. During those meetings, Ms. Parrish validated Ms. Wright's concerns, agreed that she was in an unfair situation, and that she was held to a different level of expectation and responsibility than her colleagues (who all happened to be male).  Nonetheless, the harassment and discrimination continued.

50.     In December 2017, Ms. Wright began looking for another job. She applied for, interviewed, and received a verbal offer to transfer to another Centura position at a different hospital: the Parker Adventist Hospital.  The offer was extended to Ms. Wright by Curt Johnson, the Parker Adventist Cath Lab Manager.

51.     On December 19 or 20, 2017, Ms. Wright notified her supervisors and HR that she intended to accept the offer, and to transfer to another Centura hospital.

52.     The following day, Ms. Wright was informed by Ms. Parrish that she was ineligible to transfer because a written warning concerning her performance and behavior was "in the works."  Ms. Wright had never been told or informed about a written warning.

53.     Upon information and belief, Ms. Wright was eligible to transfer, and the denial of an opportunity for her to transfer to another Centura Hospital was done in retaliation for Ms. Wright's actions in calling the Integrity Hotline, approaching HR, and taking other, similar actions in response to the discrimination and harassment against her.

54.     Because of the denial of her transfer, Ms. Wright again contacted Centura's Integrity Hotline.

55.     The report of that contact stated:  "On December 19, 2017, Stacey [sic] notified Jodi, Suzanne, and Julie about being transferred to a new location. On December 21, Stacey [sic]

was told that she would receive notification for a corrective action that was coming and would be unable to transfer.  There is no explanation as to what the report is on, but Stacy [sic] would like to get this issue addressed so her transfer can go through.  Stacy [sic] would like to know if someone can come with her to the meeting that will be set up."

56.     On December 27, 2017, seven or eight days after Ms. Wright informed Centura of her intent to transfer, Centura issued to Ms. Wright a final written warning. The final written warning – which violated Centura's progressive discipline policy (as she had never received an oral or written warning or reprimand of any kind) is replete with falsehoods, untruths, and misleading and erroneous accusations.

57.     As part of the process for issuing a final written warning to Ms. Wright, no investigation was made to determine the truth or falsity of the allegations; and no effort was made by Centura to determine Ms. Wright's position on any of the allegations.  Ms. Wright was never interviewed or questioned about the allegations. As a result, Centura did not make a fair, impartial, or objective investigation.

58.     On December 27, 2017, Ms. Wright was ordered to attend a meeting at which she was given the final written warning. The attendees other than Ms. Wright were Suzanne Parker, Julie Lombard, and Jodi Parrish.

59.     At the beginning of the meeting, Ms. Wright was required to sign "policies" that were given to her.  Upon information and belief, Ms. Wright would have been fired had she not signed the policies.

60.     The final written warning was a ridiculous three-page list of falsehoods and fabrications.  Ms. Wright explained and showed at the meeting why several of the accusations were false, but no charges were dropped from the document.

61.     After the final written warning ended, Ms. Wright met with Ms. Parrish in the Hospital break room. Ms. Parrish said to Ms. Wright, among other things:

    a.   Everyone in the Cath Lab Department looks to Ms. Wright for direction.

    b.   She (Ms. Parrish) has read all of Ms. Wright's past evaluations and they are all good.

    c.   The situation has been awful; it is a bad situation. Ms. Parrish said that they could still explore "the transfer option."  She knows how bad this whole thing has been but she doesn't want Ms. Wright to get the brunt of it all.

    d.   Ms. Wright is in "self-preservation mode" and Ms. Parrish "gets it."

    e.   If the final written warning were to go in Ms. Wright's file, and Ms. Wright subsequently went to work at another medical facility, the person at the new position responsible for hiring "could call her [Ms. Parrish] and she will explain."

    f.   "I think this situation [bringing in Ms. Parker and Ms. Lombard] has been bad and it was not done well, and that's on us and I don't want you to have to pay for that."

    g.   She (Ms. Parrish) is seeing both sides-and that there are some issues on the side of leadership and "I'm not letting that go."

     h.   "it's not over. We will get someone in with knowledge and stability. We can all start over with a clean slate."

     i.   At the end of the meeting between Ms. Wright and Ms. Parrish, she warned Ms. Wright: "Be careful what you share with everyone right now because you don't want it to get twisted."

62.     On January 2, 2018, Ms. Wright submitted to Ms. Parrish an "Alternative Dispute Resolution Process (ADR) Response Form ("Response Form"). In it, Ms. Wright wrote the following: "Received an inaccurate, unfair corrective action on 12/27/17. I have not received a previous verbal or written counseling. Per a minimum of two (2) previous discussions, my charge duties were being performed by a manager. As a result, I [unclear] taking charge as of 12/11/17. Further, I am able to provide documented and unbiased proof to discount each of the three issues which are the basis of said correction action."

63.     As the requested remedy, Ms. Wright stated: "Remove corrective action form from file immediately and allow for my transfer to Parker Adventist Hospital now."

64.     On January 5, 2018, Ms. Wright hand-delivered a copy of the Response Form to Ms. Parrish.

65.     On information and belief, no action was taken because of the submitted Response Form.

66.     On or about January 2, the Group Vice President of Human Resources for Centura, Sondra Davis, wrote a follow-up question/comment to Ms. Wright's Integrity Hotline submittal. It stated: "Thank you for contacting the Centura Health Integrity Helpline. We appreciate the information you provided. To better understand the situation please provide a synopsis of the issues

that you would like addressed. You can provide those thru the Helpline or email me directly at sondradavis@centura.org."

67.     Ms. Wright met with Ms. Davis in response to her follow-up question/comment. Ms. Davis took information from Ms. Wright, and Ms. Davis agreed that some of the information was conflicting. Specifically, Ms. Davis found a conflict between Ms. Wright's recognition as a CRISSIE award recipient, and then Ms. Wright suddenly being the worst employee on the planet. Ms. Davis said that she took people's livelihood very seriously, and promised that she would look into the situation.

68.      Upon information and belief, Ms. Davis conducted no investigation into Ms. Wright's situation.

69.     On or about January 8, 2018, Frank Archuleta became (officially) the Manager of the Cath Lab.  This official designation was undercut when the Cath Lab employees were sent an email emphasizing that Ms. Lombard was still the Lab's "acting" manager until Mr. Archuleta became better acquainted with the Castle Rock Hospital.

70.     Ms. Wright was enthusiastic about Mr. Archuleta's presence. Ms. Wright told Mr. Archuleta on more than one occasion that she was willing to help him in whatever capacity was necessary to ensure the success of the Department.

71.     Mr. Archuleta enlisted Ms. Wright's support, and sought her opinions, on several occasions regarding how the Lab functioned, background on physician support, work flows, and other similar matters.

72.     For example, Mr. Archuleta, on January 22, 2019, asked Ms. Wright to help him "re-engage" two of the male Cath Lab nurses, John West and Frank Przymus, as they seemed to be "removed" and "not involved" in the progression of the Lab.

73.     Ms. Wright assured Mr. Archuleta that she would do whatever he needed her to do.

74.     In fact, from Ms. Wright's perspective, she and Mr. Archuleta had a good working relationship. They had several lengthy and involved discussions about common Cath Lab personnel they both knew; they talked about religion (Mr. Archuleta shared that he was a Catholic, and was involved in the Church); and they discussed future plans for the Department.

75.     On January 22, 2019, the same day Mr. Archuleta asked Ms. Wright to help with John West and Frank Przymus, Ms. Wright was called into a meeting where she was summarily fired. Centura gave Ms. Wright a copy of a document called a "Confidential Separation Agreement and General Release" (the "Release") in which Centura offered to pay Ms. Wright eight weeks base salary minus all withholding taxes and deductions, in exchange for a full release of claims and an agreement of confidentiality.

76.     Ms. Wright did not sign the Release.

77.     After Ms. Wright was discharged, her position was filled by a male, Jason Ritz.

**FIRST CLAIM FOR RELIEF**
**(Sexual Discrimination and Harassment in Violation of Title VII)**

78.     Ms. Wright incorporates by reference paragraphs 1 through 77 as if fully set forth in this First Claim for Relief.

79.     Centura is an employer, as defined in 42 U.S.C. § 2000e-(b) with, on information and belief, more than 20,000 employees.

80.     At all relevant times, Ms. Wright was an employee of Centura, as that term is defined in 42 U.S.C. § 2000e-(f).

81.     Title VII, 42 U.S.C.A. § 2000e-2(a) provides in pertinent part: "It shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ...."

82.     The allegations set forth in this Complaint allege a prima facie case of sex discrimination:

> a.   Ms. Wright is a member of a protected class based on her sex:  female.
>
> b.   Ms. Wright experienced disparate treatment as a result of intentional discrimination on the part of Centura, in that it harassed her, treated her less favorably than her male colleagues, and terminated her based on false allegations.
>
> c.   Ms. Wright was qualified for and satisfactorily performed her job; indeed, immediately before Ms. Wright began being subjected to disparate treatment by Centura, she had received awards and recognition for the quality of her work.
>
> d.   Ms. Wright's complaints were ignored, and she was punished, discriminated against, and terminated under circumstances giving rise to an inference of discrimination. Among other things, Centura's failure to take any legitimate actions because of her calls to the Centura Integrity Hotline or her submission of the Response Form, show an intentional, malicious, or

      recklessly indifferent response to the harassment and discrimination she was suffering.

    e.  Further, male employees were given preferential treatment; the allegations made against Ms. Wright were subjective and false; Centura acted against its written company policy of progressive discipline; and after Ms. Wright was wrongfully discharged, she was replaced by a male.

    f.  Ms. Wright's sex was a determinative factor in Centura's discriminatory actions, and Centura's explanation for its actions were not credible but were merely pretext.

83.    Based on Ms. Wright's allegations establishing a prima facie case, and her allegations showing that the purported justifications were false, untimely, and unworthy of belief, a reasonable jury could find that Centura discriminated against Ms. Wright because of her sex, in violation of Title VII.

84.    Because of Centura's violation of Title VII, Ms. Wright has suffered injury and damages, including pecuniary and non-pecuniary damages, in an amount to be proven at trial.

85.    Centura's discrimination and wrongful conduct toward Ms. Wright was done intentionally, and with malice or reckless indifference, entitling her to punitive damages.

86.    Ms. Wright has also suffered damages for which equitable relief (including but not limited to expunging her record) is available. The nature or amount of such equitable relief is to be proven at trial.

**SECOND CLAIM FOR RELIEF**
**(Discrimination/Retaliation for Making Charges, in Violation of Title VII)**

87.     Ms. Wright incorporates by reference the allegations set forth in paragraphs 1 through 86, including all subparagraphs, as if fully set forth in this Second Claim for Relief.

88.     42 U.S.C.A. § 2000e-3(a) provides: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees … because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

89.     As set forth above, Ms. Wright complained of harassment and discrimination to which she was being subjected, both to Centura's "Integrity Hotline," and to Centura's Human Resources Department.

90.     When the harassment continued unabated, Ms. Wright applied for, interviewed, and received a verbal offer to transfer to another hospital.  Centura rejected the transfer.

91.     Centura's actions, including but not limited to, issuing an unwarranted and fallacious final written warning against Ms. Wright, depriving Ms. Wright of the right to transfer to another Centura hospital, and terminating Ms. Wright's employment, were in retaliation for her complaints to HR and Centura's Integrity Hotline.

92.     Centura's adverse employment actions took place after Ms. Wright complained about the discrimination and harassment.

93.     Centura violated 42 U.S.C.A. § 2000e-3(a) by retaliating, discriminating, and subjecting Ms. Wright to adverse employment actions for bringing claims of discrimination, and harassment.

94.     Because of Centura's violations of 42 U.S.C.A. § 2000e-3(a), Ms. Wright has suffered injury and damages in an amount to be proven at trial.

95.     Ms. Wright has also suffered damages for which equitable relief is available.  The nature or amount of such equitable relief is to be proven at trial.

96.     Centura's discrimination and retaliation against Ms. Wright was done with malice or reckless indifference.

## JURY DEMAND

Ms. Wright demands a jury trial on all claims or issues so triable.

## PRAYER FOR RELIEF

ACCORDINGLY, Ms. Wright requests judgment in her favor, and against Centura for the following:

A.     Back pay, including but not limited to wages, salaries, bonuses, and benefits, to be adjusted for tax consequences of receiving a lump-sum back pay in a single year;

B.     Reinstatement and restoration of benefits;

C.     Front pay;

D.     Compensatory damages, including but not limited to future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, harm to reputation, and other pecuniary or nonpecuniary losses;

E.     Pre- and post-judgment interest at the statutory rate;

F.     Under Title VII, costs, expenses, and attorney fees incurred in connection with this action;

G.     Punitive or exemplary damages;

H.     Equitable relief, not otherwise requested in this Prayer for Relief

I.      Affirmative relief such as expunging adverse material from personnel files, providing

positive letters of recommendation, and classifying Ms. Wright as eligible for re-hire.

J.      Such other and further relief as this Court deems just and proper

        Respectfully submitted this 11th day of April, 2019.

ANDERSON BARKLEY, LLC

*A duly signed copy is on file at the*
*offices of Anderson Barkley, LLC*

s/ Jeanine M. Anderson
***Jeanine M. Anderson***
Anderson Barkley, LLC
3900 E. Mexico Ave., Suite 300
Denver, CO 80210
(720) 506-1766
Jeanine@AndersonBarkleyLaw.com
Attorney for Plaintiff


s/ Richard P. Barkley
***Richard P. Barkley***
Anderson Barkley, LLC
3900 E. Mexico Ave., Suite 300
Denver, CO 80210
(720) 506-1767
richardbarkleylaw@comcast.net
Attorney for Plaintiff

ANDERSON BARKLEY, LLC