**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-01067-WJM-STV

STACEY WRIGHT, a Colorado resident,

Plaintiff,

v.

PORTERCARE ADVENTIST HEALTH SYSTEM,
A Colorado nonprofit corporation,
d/b/a CENTURA HEALTH –
CASTLE ROCK ADVENTIST HOSPITAL,

Defendant.

---

## FINAL PRETRIAL ORDER

---

## 1. DATE AND APPEARANCES

The Final Pretrial Conference is scheduled for August, 18, 2020, at 10:00 a.m., via telephone conference before Magistrate Judge Scott T. Varholak.

Plaintiff, Stacey Wright ("Ms. Wright"), is represented by:

Jeanine Anderson
Richard Barkley
Anderson Barkley, LLC
3900 E. Mexico Avenue, Suite 300
Denver, Colorado 80210
(720) 506-1766
jeanine@andersonbarkleylaw.com
richard@andersonbarkleylaw.com

Defendant, Portercare Adventist Health System, d/b/a Centura Health ("Centura"), is represented by:

Mark L. Sabey
M. Brian Sabey
Hall, Render, Killian, Heath & Lyman, P.C.
1512 Larimer Street, Suite 300
Denver, Colorado 80202
(303) 801-3538 / (720) 282-2025
marksabey@hallrender.com
briansabey@hallrender.com

## 2. JURISDICTION

This Court has jurisdiction over this action under 28 U.S.C. § 1331 because the claim brought by Plaintiff arises under the laws of the United States. (*See* Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*)

## 3. CLAIMS AND DEFENSES

A.     *Factual Explanation of Plaintiff's Claims of Discrimination*:

Plaintiff, Stacey Wright ("Ms. Wright") began working as a registered nurse, and she quickly became regarded as a stellar nurse and employee. Ms. Wright's manager until mid-2017 stated about Ms. Wright:

> "Stacey is one of the most skilled nurses that I've ever worked with in all of my years in the healthcare industry, and it is difficult for me to find anything to complain about when it comes to Stacey's work performance."

Stacey's abilities were also recognized hospital-wide. To give just one example, in late October 2017 Ms. Wright was presented with the prestigious CRISSIE Award, which came with a cash component. In presenting the award to Ms. Wright, Suzanne Parker, the Department Director, stated:

> Since I have become a member of the Cath lab team, Stacey has been a rock! She displays a positive attitude, seeks to create seamless care for patients by bridging the gap between areas such as the cath lab, IR, Preop and PACU, She has been a

font of information and support to me and the entire cath lab team.  Thank you Stacey!

In October 2017, Julie Lombard ("Ms. Lombard") was promoted to the position of Cath Lab Manager.  At that time, and throughout Ms. Lombard's tenure with the Cath lab, Ms. Wright was its only female team member.

From the outset, Ms. Lombard treated Ms. Wright differently from the male members of the Cath lab team. After her first meeting with Ms. Wright, Ms. Lombard began preparing a "log" of her interactions with Ms. Wright.  Ms. Lombard did not prepare a similar log documenting her interactions with any of the male members of the Cath lab. Ms. Lombard has never been able to explain why she kept a log of her conversations and interactions with Ms. Wright, but no one else.

On December 11, 2017 at 8:22 a.m., Ms. Lombard sent a message to the entire staff of the Cath lab to assist the Post-Anesthesia Care Unit ("PACU"), as needed. Ms. Wright checked in with PACU that morning, and was told that if they needed any help, it would be in the afternoon. As a result, she took an early lunch break and ran to Walmart to pick up her child's Christmas gift (which she understood had come in). It was common practice in the Cath lab for employees to run short personal errands during the day if they were not busy (after making sure there was coverage and signing out). She notified Ms. Lombard, clocked out, and was gone precisely 30 minutes, the length of her lunch break. On her return, Ms. Wright repeatedly checked in with various members of the PACU to see if they needed assistance, including Donna at around 10:45 a.m., Carrie at 11:15 a.m., and again with Donna and Wes at around 12:35 p.m., who told Ms. Wright that PACU had no patients. When Ms. Lombard questioned Ms. Wright about the propriety of her early lunch break, Ms. Wright told her that it was common practice, and said that Mr. Royer, Mr. Pryzmus, and Mr. West would confirm that common practice.

3

Ms. Wright also told Ms. Lombard that she had checked in with PACU both before her early lunch break.  Ms. Wright asked Ms. Lombard and Ms. Parker why she was being treated differently from the male employees who worked in the Cath lab, and whether Ms. Lombard and Ms. Parker believed that the male staff members just never ran errands. In response, Ms. Parker confirmed that she knew the male employees ran errands, but they did not notify management when they did so. Ms. Parker acknowledged that Ms. Wright was the only one who ever provided notice before leaving for an errand.

Despite this admission – and despite Ms. Lombard's failure to verify the information given to her by Ms. Wright – Ms. Lombard decided that she was going to give Ms. Wright a written warning about the incident. She wrote up the incident and sent it to HR, which questioned its merits:

> Do you think there is any credibility to Stacey's claim that others in the department leave during the middle of the day?  We just need to be careful that we don't only discipline Stacey if others are doing it.  My recommendation before delivering the corrective action would be to audit visually via timecard, but also ask the permanent members of the staff in the department what the past practice as (sic) been.

On or about December 20, 2017 Ms. Wright received a job offer from the Centura Parker Adventist Hospital. The same day, Ms. Wright notified her supervisors, and HR, of her intent to transfer. Although Ms. Wright met all of the criteria for transferring to another Centura facility, HR notified Ms. Wright that she was ineligible for the transfer because Centura "had already decided, prior to your email notice, to place you on corrective action due to your conduct these past couple of months."

The written warning prepared by Ms. Lombard was never issued to Ms. Wright. Instead, on December 27, 2017, Centura issued a **Final** Written Warning to Ms. Wright despite the fact that

she had never before been given a Verbal Warning or a Written Warning on a Corrective Action form.

On January 8, 2018, Frank Archuleta became the Manager of the CRAH Cath lab. Less than a week later, Mr. Archuleta went to Human Resources and attacked Ms. Wright for an incident that arose that was related to the manner in which the Cath lab was charging for medicine.  Mr. Archuleta observed RN John West charging for an entire bottle of medicine, rather than the amount actually administered.  Mr. West explained that he understood that if the remainder of the medicine had to be discarded, and the patient was onetime, you charged for the full bottle rather than the amount administered.  Frank Przymus (who was also in the pain clinic at the time) commented that this was his understanding of how medicine was to be charged for as well.  Ms. Wright further confirmed that Mr. West was following the practice the Cath lab had been following. Nonetheless, Mr. West, Mr. Przymus, and Ms. Wright all agreed that they would follow Mr. Archuleta's lead and charge for medicine how Mr. Archuleta wanted them to do going forward.

Mr. Archuleta concluded, however, that **Ms. Wright** was not telling the truth, and reported the incident to Human Resources.  Mr. Archuleta, however, did not report Mr. West or Mr. Prymus for saying the same thing Ms. Wright said. Further, if Mr. Archuleta had talked to his predecessor, Mr. Royer, Mr Archuleta would have learned that the way the Cath lab team was charging for medicine was the way Mr. Royer had instructed  them to do it. Thus, Mr. Archuleta's allegation of untruthfulness against Ms. Wright had no merit.

Shortly after Mr. Archuleta's complaint, HR decided that Ms. Wright should be fired. On January 22, 2018, Ms. Wright was called into a meeting with HR and told her employment had been terminated. Ms. Wright was not given a specific reason, but was told generally that things

just were not working out. After Ms. Wright was terminated, the next permanent nurse that was hired in the Cath lab was Jason Ritz.  He was hired on or about February 25, 2018.

On or about April 11, 2019, Ms. Wright filed an action against Centura in which she alleged claims for sexual discrimination and harassment as well as discrimination and retaliation for making charges in violation of Title VII (42 U.S.C. § 2000e *et seq.*). Ms. Wright seeks damages and equitable relief as a result of Centura's violations of Title VII.

B.     *Defendant's Defenses to Plaintiff's Claims:*

Defendant's basic theory of the case is set forth in its motion for summary judgment. To summarize, Wright is now claiming that she was treated less favorably than her male co-workers because of her gender and/or retaliated against for complaining about such discrimination. However, at the time she never claimed that she was being treated less favorably because of gender. Instead, she repeatedly expressed that she was dealing with a personality conflict with Julie Lombard, her new and unpopular manager. Wright also gave other explanations of contributing factors in how she was being "targeted," but none of them had anything to do with her gender. Therefore, she never engaged in any protected activity, and her current revisionist claim that it actually was gender that accounted for her disparate treatment rings hollow. Additionally, there were actual problems with Wright's performance that are admitted or beyond reasonable dispute: she was "less than friendly" towards her new manager Lombard (Wright's own words— Lombard's words express a far more egregiously hostile interpersonal stance, in alignment with what John Wright expressed in his first affidavit). Wright failed to proactively assist Lombard in completing certain monthly reports and teaching Lombard how to complete such reports even though Lombard repeatedly asked Wright to do so. Indeed, Wright refused to simply complete the

reports herself, since she held that it was a job of the manager to do that, even though Wright had been completing them herself in the approximately two-month absence of a manager prior to Lombard starting. Because of Wright's clear refusal to fully support her new manager, she was ultimately issued a Final Written Warning based on three instances of behavior that expressed and instantiated her lack of support for Lombard. For these same reasons, when Wright attempted to escape by transferring to a sister-hospital, the HR Director determined that it would not be appropriate to permit the transfer until the pending issues had been resolved. Lombard was then replaced by a new manager, Frank Archuleta. Archuleta independently ascertained and reported that Wright did not seem to be supporting him fully. Because two managers in a row had expressed their concerns that Wright was not fully supporting them, her employment was terminated. Besides proving the legitimate, nondiscriminatory reasons for all adverse employment decisions, Centura intends to assert the following affirmative defenses.

Plaintiff's damages were caused by her own acts, not Defendants. Plaintiff has failed to mitigate her damages. Defendant's employment decisions regarding or affecting Plaintiff were based upon lawful, legitimate, non-discriminatory, non-pretextual, and nonretaliatory business reasons. Defendant would have made the same employment decisions regarding or affecting plaintiff regardless of Plaintiff's allegedly protected status or activity. All of Defendant's actions and inactions with respect to Plaintiff were for just and good cause, taken in good faith, without malice or reckless indifference, and with reasonable grounds to believe that it was not in violation of any state or federal law.

## 4.  STIPULATIONS

The following facts are undisputed:

1.      Ms. Wright was employed at Castle Rock Adventist Hospital ("CRAH") from June 10, 2013 to January 22, 2018 (except for a brief period between October 24, 2015 through January 19, 2016).

2.      Ms. Wright was recognized for her leadership in the Cath Lab. (Depo. Ex. 40).

3.      Ms. Wright was given the Final Written Warning on December 27, 2017 (Depo. Ex. 25).

4.      Ms. Wright was terminated on January 22, 2018. (Response Ex. 42).

## 5. PENDING MOTIONS

The following motion is currently pending:

1.      Defendant's Motion for Summary Judgment.  This Motion was filed with the Court via CM/ECF and served on Plaintiff on March 25, 2020. Plaintiff filed with the Court and served via CM/ECF their Response to Motion for Summary Judgment on June 1, 2020. Defendant filed with this Court and served via CM/ECF their Reply in Support of Motion for Summary Judgment on July 5, 2020.

## 6. WITNESSES

a.      Non-expert Witnesses

    1. See Plaintiff's Witness List attached hereto.

    2. See Defendant's Witness List attached hereto.

b.      Expert Witnesses

    1. See Plaintiff's Witness List attached hereto.

    2. See Defendant's Witness List attached hereto.

## 7. EXHIBITS

a.      See Plaintiff's Exhibit List

b.       See Defendant's Exhibit List

c.       Copies of listed exhibits must be provided to opposing counsel no later than 30 days before trial.  The objections contemplated by Fed. R. Civ. P. 26(a)(3) shall be filed with the clerk and served by hand delivery or facsimile no later than 14 days after the exhibits are provided.

## 8. DISCOVERY

Discovery has been completed.

## 9. SPECIAL ISSUES

None.

## 10. SETTLEMENT

a.      Counsel for the parties attempted to mediate through the EEOC.

d.      Counsel for the parties do not intend to hold future settlement conferences.

e.      It appears from the discussion by all counsel that there is little possibility of settlement.

f.      Counsel for the parties and any *pro se* party considered ADR in accordance with D.C.COLO.LCivR.16.6.

## 11. OFFER OF JUDGMENT

Counsel for the parties acknowledge familiarity with the provision of Rule 68 (Offer of Judgment) of the Federal Rules of Civil Procedure. Counsel have discussed it with the clients against whom claims are made in this case.

## 13. EFFECT OF FINAL PRETRIAL ORDER

Hereafter, this Final Pretrial Order will control the subsequent course of this action and the trial, and may not be amended except by consent of the parties and approval by the court or by

order of the court to prevent manifest injustice. The pleadings will be deemed merged herein. This Final Pretrial Order supersedes the Scheduling Order. In the event of ambiguity in any provision of this Final Pretrial Order, reference may be made to the record of the pretrial conference to the extent reported by stenographic notes and to the pleadings.

### 13. TRIAL AND ESTIMATED TRIAL TIME; FURTHER TRIAL PREPARATION PROCEEDINGS

1.  The trial will be before a jury,

2.  with an anticipated length of 5 days

3.  to be held on a date not yet determined, and

4.  And any other orders pertinent to the trial proceedings.

DATED this 18th day of August, 2020.

BY THE COURT

Honorable Scott T. Varholak,
United States Magistrate Judge

APPROVED:

/s/ Richard P. Barkley
Richard P. Barkley, Esq.
Jeanine M. Anderson, Esq.
Anderson Barkley, LLC
3900 E. Mexico Ave., Suite 300
Denver, Colorado 80210
richard@andersonbarkleylaw.com
jeanine@andersonbarkleylaw.com

/s/Mark L. Sabey
Mark L. Sabey
M. Brian Sabey
Hall, Render, Killian, Heath & Lyman, P.C.
1512 Larimer Street, Suite 300
Denver, CO 80202
marksabey@hallrender.com
briansabey@hallrender.com

Attorneys for Plaintiff                    Attorneys for Defendant