## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Civil Action No. 19-cv-1067-WJM-STV

STACEY WRIGHT,

     Plaintiff,

v.

PORTERCARE ADVENTIST HEALTH SYSTEM, a Colorado nonprofit corporation
d/b/a Centura Health - Castle Rock Adventist Hospital,

     Defendant.

---

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

This gender discrimination and retaliation dispute is before the Court on
Defendant Portercare Adventist Health System's ("Centura") Motion for Summary
Judgment (ECF No. 28), to which Plaintiff Stacey Wright filed a response (ECF No. 32),
and Defendant replied (ECF No. 43.)  For the following reasons, the Motion for
Summary Judgment is granted.

### I. STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the
movant shows that there is no genuine dispute as to any material fact and the movant
is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v.
Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the
relevant substantive law, it is essential to proper disposition of the claim.  *Wright v.
Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if
the evidence is such that it might lead a reasonable trier of fact to return a verdict for

the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence
and all reasonable inferences therefrom in the light most favorable to the nonmoving
party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In
addition, the Court must resolve factual ambiguities against the moving party, thus
favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th
Cir. 1987).

## II. BACKGROUND

**A.    Factual Allegations[1]**

1.    *Wright's Interactions with Julie Lombard*

Stacey Wright worked as the charge nurse in the cardiac catheterization lab
("cath lab") at Castle Rock Adventist Hospital from June 10, 2013 through January 22,
2018, with one break for personal reasons in 2015.  (ECF No. 28 at 1.)  From 2013 to
mid-2017, Wright's manager in the cath lab was Russ Royer.  (ECF No. 32-13 ¶ 13.)
After Royer's departure from the cath lab, both staff and physicians encouraged Wright
to apply for the vacant cath lab manager position, which she did.  (ECF No. 28-16 at
22:7–24:19; ECF No. 28 at 6.)  However, in October 2017, Julie Lombard obtained the
position of cath lab manager.  (ECF No. 32-28.)  The decision to hire Lombard
frustrated and discouraged the cath lab staff members, including Wright.  (ECF No. 32-

---

[1] The following factual summary is based on the parties' briefs on the Motion for
Summary Judgment and documents submitted in support thereof.  These facts are undisputed
unless attributed to a party or source.  All citations to docketed materials are to the page
number in the CM/ECF header, which sometimes differs from a document's internal pagination.

29.)  At that time, the cath lab came under the purview of the Chief Nursing Officer, Carol Pontius, who implemented a new management team, including Suzanne Parker, who was a new director, and Lombard.  (ECF No. 28 at 1.)

At the time Lombard became manager, the cath lab team consisted of the following employees: (1) Stacey Wright; (2) Frank Przymus; (3) John West; and (4) Ryan Voegle.[2]  (ECF No. 32-5 at 71:19–72:15.)  Voegle resigned during Lombard's tenure, but no other changes were made to the permanent staff of the cath lab during Lombard's tenure.  (*Id.* at 137:17–138:5; ECF No. 32-1 at 9:11–10:10.)  Wright asserts that she was the only female team member during Lombard's tenure (ECF No. 32 at 11 ¶ 15), but Centura points out that although Wright was the only female permanent non-managerial staff member at the time, there were travelers and other non-permanent staff, many of whom were female (ECF No. 43 at 5 ¶ 15).  Centura also highlights that the management team was also predominantly female.  (ECF No. 43 at 5 ¶ 15.)

***Lombard's Log of Interactions with Wright***: Wright states that around October 15, 2017, Lombard began preparing a log of her interactions with Wright.  (ECF No. 32 at 11 ¶ 16.)  However, Lombard did not prepare a similar log documenting her interactions with the other members of the cath lab, all of whom were male.  (ECF No. 32 at 11 ¶ 17.)  Wright states that at first, Lombard could not explain why she kept a log of her interactions with Wright, but later changed her testimony after apparent coaching.  (ECF No. 32 at 11 ¶ 19.)  By contrast, Centura admits that while Lombard's testimony on the log was unclear at first, Lombard later clarified that her log was an ongoing

---

[2] The record contains different spellings of Ryan Voegle's last name.  The Court uses Wright's spelling.  (ECF No. 32 at 10 ¶ 13.)

compilation where she would note coaching given to employees.  (ECF No. 43 at 5–6 ¶ 16.)  Acknowledging that she only transferred her notes regarding Wright to the computer, Lombard further clarified that "as conflicts began to arise," she was "more specific with [her] notes . . . and then [she] began to type them into the . . . computer."  (ECF No. 43 at 5–6 ¶ 16.)

**_Data Reports_**: According to Centura, the South Denver Cardiology physicians group expected the cath lab to deliver monthly data reports, including the ACS[3] Dashboard and Electrophysiology ("EP") Dashboard data.  (ECF No. 28 at 8; ECF No. 28-5 at 1 ¶ 4.)  On October 24, 2017, Wright e-mailed Lombard regarding the ACS data spreadsheet, explained how the process worked, and offered to help.  (ECF No. 32-8.)  That same day, Wright e-mailed Lombard regarding NCDR[4] databases and the EP Dashboard, offering her help.  (ECF Nos. 32-9, 32-14.)  Wright asserts that Lombard did not respond to her e-mails until November 6, 2017.  (ECF No. 32-12 ¶ 7; ECF No. 32-9; ECF No. 32-10.)  However, Centura states that although Lombard did not communicate with Wright via e-mail about the required reporting between October 24, 2017 and November 6, 2017, during that time, Lombard attempted to communicate with Wright via text message.  (ECF No. 43-4 at 96:7–13; 98:10–13.)

On November 6, 2017, Lombard e-mailed Wright, asking that Wright keep maintaining the databases until Lombard could get up to speed and that they have a standing weekly appointment to help Lombard do so.  (ECF Nos. 28-47, 28-48, and 28-

---

[3] The meaning of "ACS" is not clear from the record.

[4]  The meaning of "NCDR" is not clear from the record.

49.)  Centura asserts that on November 7, 2017, Lombard met with Wright, Parker, and Jodi Parrish, a Human Resources Director, to clarify expectations about communication and to discuss Wright educating Lombard as to how to do the data reports; Lombard testified that she involved HR in the meeting with Wright because there were "some issues with [Wright] responding to [Lombard's] texts and not coming down to teach [Lombard]."[5]  (ECF No. 43 at 8 ¶ 23; ECF No. 43-4 at 94:9–17.)  The discussion focused on transitioning the ACS abstracting and EP Dashboard to Lombard, projects with which Wright had assisted the director during the interim absence of a manager.  (ECF No. 32 at 12 ¶ 29.)  In response to Lombard's request to provide training, Wright told Lombard that "after the morning cases would work" for Wright to provide such training.  (ECF No. 28 at 28 ¶ 14.)  However, Wright did not provide such training after the morning cases.  (ECF No. 28 at 28 ¶ 15.)  Ultimately, Wright did not complete the data reports for October, November, or December 2017.  (ECF No. 28 at 28 ¶ 11.)

**_Request for OR/PACU[6] Assistance_**: On December 11, 2017, Lombard and Wright exchanged these text messages:

> **Lombard**: The OR needs help today with admission vitals and IV's Would you all please go over to help?
>
> **Wright**: Ok
> Im running over to Walmart. Be right back.

---

[5] The parties dispute whether the November 7, 2017 meeting was disciplinary in nature. Wright states the meeting was not a disciplinary meeting.  (ECF No. 32 at 12 ¶ 30.)  But Centura states that Parrish classified the meeting as a "coaching conversation," which is a non-punitive form of discipline.  (ECF No. 43 at 8 ¶ 30.)

[6] The parties refer to the department, which is the same space for the purposes of this motion, as "OR" (Operating Room) or "PACU" (Post-Anesthesia Care Unit).  (ECF No. 28 at 14 n.3.)

> **Lombard**: Btw when you get back come see me....
> Come see me in suz's office let me know when ur back from
> Walmart

(ECF No. 28-27.)  While Wright was at Walmart, Lombard called the OR charge nurse

to ask if anyone from the cath lab had come to assist and was told that no one had.

(ECF No. 28 at 28 ¶ 17.)  Although Lombard had asked Wright to see her when she

returned from Walmart, Wright did not do so until about thirty minutes after she clocked

back in, and much of the intervening time was spent chatting with Clint Watson.  (ECF

No. 28 at 28 ¶ 19.)  Centura states that to Parrish and Lombard's knowledge, no other

member of the cath lab staff had ever left to run a personal errand without explanation

while a specific assignment from the manager was pending.  (ECF No. 28 at 29 ¶ 21.)

According to Centura, Lombard perceived Wright's behavior that morning as

insubordinate.  (ECF No. 28 at 29 ¶ 20.)

Wright explained to Lombard that running short errands was a regular practice

under Royer.  (ECF No. 32 at 13 ¶ 35.)  However, without investigating either what

Wright told her about the previous practice or Wright's attempts to reach out to the

PACU, Lombard immediately (on December 11, 2017) drafted a proposed corrective

action (at the level "Written Warning") and submitted it to HR for approval.  (ECF No. 32

at 13–14 ¶ 37.)

Allyssa Gleason in HR responded to Lombard and stated:

> Do you think there is any credibility to [Wright's] claim that
> others in the department leave during the middle of the day?
> We just need to be careful that we don't only discipline
> [Wright] if others are doing it.  My recommendation before
> delivering the corrective action would be to audit visually via
> timecard, but also ask the permanent members of the staff
> in the department what the past practice as [*sic*] been.

(ECF No. 32 at 14 ¶ 38.)

*__Training Temporary Employees__*: The parties dispute whether Wright was asked to train some temporary (also referred to as "traveling") employees on December 18, 2017, with Wright stating she was not specifically asked to train certain temporary employees (ECF No. 32 at 19 ¶ 76), and Centura stating that Lombard asked Wright to precept the temporary employees (ECF No. 43 at 11 ¶ 76.) Wright states that she explained during the corrective action meeting that there was no reason why she was required for the precept, because training the new staff was not specifically the responsibility of the charge nurse. (ECF No. 32 at 19 ¶ 78.) Centura states Wright *was* needed to precept because she was asked to do so by her manager, and it is a charge nurse responsibility. (ECF No. 43 at 12 ¶ 78.)

2.   *Denial of Transfer*

On December 19, 2017, Wright interviewed for a new position at Parker Adventist Hospital (apparently a Centura Health facility) with the manager of the Parker Adventist cath lab, Curt Johnson. (ECF No. 28 at 17.) On December 20, 2017, Wright notified her supervisors and HR of her intent to transfer. (ECF No. 32 at 14 ¶ 39.) The parties dispute whether Wright actually received a job offer from Parker Adventist, with Wright stating she received an offer and notified her supervisors and HR of her intent to transfer (ECF No. 32 at 14 ¶ 39), and Centura stating that Wright never received a job offer and that Johnson stated he would never have made a job offer during an initial interview (ECF No. 43 at 9 ¶ 39, 10 ¶ 58).

At Centura, an employee is eligible for a transfer if "No written warning or Performance Improvement Plan (PIP) within the last six months unless their manager

7

receives approval from HR."  (ECF No. 32 at 14 ¶ 40.)  As of December 15, 2017,

Gleason—who had reviewed and commented on Lombard's draft corrective action four

days earlier—knew Wright had an interview at Parker Adventist but did not advise

Wright before she interviewed that she would be ineligible for the transfer based on the

pending corrective action.  (ECF No. 32 at 15 ¶¶ 42–44.)  Wright contends that she

believed she met the transfer requirements and had no reason to be aware at the time

that she was ineligible to transfer; she did not receive any written discipline before the

Final Written Warning, the disciplinary action which she would later receive on

December 27, 2020.  (ECF No. 32 at 15 ¶¶ 46–47.)

On December 21, 2017, Parrish advised Wright via e-mail that she was ineligible

for the transfer:

> You need to be aware CRAH had already decided, prior to
> your email notice, to place you on corrective action due to
> your conduct these past couple of months.  Because the
> corrective action is already in the works, you are ineligible to
> transfer at this time.  Leadership will be meeting with you
> soon to review the corrective action and set expectation.

(ECF No. 32 at 15 ¶ 48.)  Sondra Davis, the regional Vice President of HR, advised

Parrish on this matter, telling her to inform Wright a corrective action was in the works

that would make her ineligible for transfer.  (ECF No. 32 at 17 ¶ 56.)  Ultimately,

Parrish, Davis, and Todd Folkenberg (the hospital's CEO) made the decision not to

allow Wright to transfer.  (ECF No. 32 at 17 ¶ 59.)

On December 21, 2017, Wright initiated a complaint with the Integrity Helpline,

objecting to the decision to not allow her to transfer.  (ECF No. 32 at 17 ¶ 61; ECF No.

32-39.)  Davis was assigned to investigate the Integrity Helpline complaint, and in doing

so, Davis interviewed Wright, Parrish, Lombard, and Parker.  (ECF No. 32 at 18 ¶¶ 66, 68.)

    3.    *Final Written Warning and Appeals*

On December 27, 2017, Wright received a Corrective Action Form with a disciplinary action designation of "Final Written Warning."  (ECF No. 32 at 18 ¶¶ 69–70.)  Under Reason Action Required, the following incidents were noted:[7]

- <u>November 7, 2017</u>: During a coaching session with her manager and director, a conversation was had regarding transitioning some of the duties she had been completing during the interim absence of a manager in the Cath Lab department. Those items were ACS abstracting, EP dashboard, control room white board, billing, and scheduling. Stacey had agreed to transition those items to the Cath Lab manager, but was still interested in completing the ACS Abstracting. There were numerous attempts made by the Cath Lab manager to set up time to review these transition items which were unsuccessful due to Stacey's lack of cooperation and follow through. On 12/13 Director and Manager were on the monthly South Denver Group EP quality meeting when it was noted that none of CRAH's data had been reported since October.  Additionally, "bleeding risk scores" had not been reported to South Denver since July 2017.  On 12/18 Stacey spent approx. 5 minutes with manager regarding the EP data.

- <u>December 12, 2017</u>[8]: Stacey, charge nurse, was asked by her manager at 8:22 a.m. to go help the PACU department because they needed help with IV's and vitals.  Instead of going to help the PACU, she passed the message to the other members of the Cath Lab team. At 8:31, Stacey texted her manager back and stated "I'm running over to Walmart. Be right back".  Stacey clocked out and left campus to go to the store.  At 8:45 the manager spoke with the charge nurse of PACU who shared that no one from the Cath Lab team had come over to help.

  The first problem is she was the only RN in the Cath Lab and the PACU needed help getting IV's started.  However, due to a lack of IV skills, the techs that eventually did respond to PACU were unable to assist with the requested patient care needs.  Stacey willfully disregarded her manager's request and was not there for the team.  The second problem is she did not ask leaders for

---

[7] The language in the bullet points is quoted verbatim.

[8] The date on the Form is incorrect; the incident occurred on December 11, 2017.  (*See, e.g.*, ECF No. 32 at 4 ¶ 20.)

permission to leave campus.  The manager texted her at 8:44 and again at 8:53, with no response, to come see her upon Stacey's return.  Upon Stacey's return to campus, she did not go directly to her manager or director's office first as was requested.  She clocked in at 9:03 and arrived to the director's office approx. 9:30 a.m., almost a half an hour after her return from an unauthorized "errand." She did not report to the PACU during this time to assist other associates as requested.

- <u>December 18, 2017</u>: One expectation of Stacey's role as the charge nurse is to provide orientation to new staff in the department.  Two new travelers, a RN and Tech, arrived to the department to orient on 12/18/17.  On Friday, 12/15/17, the manager placed on the whiteboard that traveler staff would be arriving to the department on the afternoon of 12/18/17.  The morning of 12/18, manager arrived in the control room and spoke with the staff present (two techs) and reminded them that the traveler staff would be arriving that afternoon.  Manager requested their help in orienting them to our department.  Stacey was not present during this time.  Manager had asked Stacey at approx. 10:30 am, while she was in manager's office, to help orient the new staff who would be in the department at approximately 1:30 pm that day.  She verbally agreed.

  At approx. 1:00–1:30 the new staff arrived, however Stacey was not in the control room or the procedure room.  The manager had the techs that were present in the Cath Lab orient the staff.  As of 3:00 pm, Stacey had not returned to the lab to help orient the new staff.  Stacey did not fulfill her role as charge nurse and perform the orientation required for the new travelers.  Additionally, she did not communicate her whereabouts during this time which to date are still unknown.

  The above events exhibit the unprofessional behavior: insubordination, lack of respect, unresponsiveness, ineffective communication and negative attitude. This has led to inefficiencies, poor team morale, lack of timely reporting, weak teamwork that has ultimately impacted quality patient care.

(ECF No. 28-33.)  Under Employee Comments, Wright wrote:

> 12/12 Incident: Disagree.  Discussed [illegible] PCU RN:
> help not needed until afternoon.  Three other staff remained
> in lab; one of which able to start IV.
>
> 12/18 Unaware completely that I was expected to precept
> staff.  I was not notified that I was expected to do so.
>
> Continued.  I no longer check in as charge after a minimum
> of two discussions with management left me unclear as to
> whether I was to remain in charge.  This was ilicited [*sic*]

10

after several charge duties were removed from me by Julie, and I did not feel it was fair to continue collecting $1 [illegible] for responsibilities I was not continuing.

12/18 I was not asked at any time to precept new staff.  This alleged conversation at 10:30 did not occur [illegible] did not include asking me to precept anyone.  Ryan Voegle informed me that he was asked to precept new staff.

12/12/17 It was not clear to me that I had done anything wrong at that time.  I was unaware of urgency to report to manager's ofc. - I was stopped by another director on my way there (to office) and was conversing with him prior to meeting.

(*Id.* at 3.)

On January 5, 2018, Wright met with Parrish to discuss the Final Written Warning.  (ECF No. 28-4 ¶ 8.)  At that meeting, Wright stated, "I'm pretty sure this is a personality conflict [with Lombard]."  (ECF No. 28-4 ¶ 8; ECF No. 28-7 at 20:23–21:17.)

To appeal the Final Written Warning, Wright initiated the Alternative Dispute Resolution ("ADR") procedure.  (ECF No. 32 at 20 ¶ 81; ECF No. 32-41.)  Davis was assigned to investigate the ADR complaint.  (ECF No. 32 at 20 ¶ 86.)

On January 8, 2018, Wright met with Davis.  (ECF No. 28-2.)  Centura states that they discussed, among other things, the "down time" culture, Wright's emotional difficulty accepting Lombard as a manager, and the extent of the charge nurse's duties; the meeting was part of Davis's investigation of Wright's Integrity Helpline and ADR complaints.  (ECF No. 28 at 20.)  Centura quotes Wright's statements from the Davis meeting transcript, noting that her issues at work were "part of a misunderstanding" and "a personality conflict."  (*Id.* at 21.)  At that meeting, Wright told Davis:

I'm the only female on the . . . staff.  But another male employee, he left in the middle of our 20-patient pain clinic

11

> day, and he was gone for two and a half hours and he
> picked up his wife at the airport.
>
> So I don't understand why that was not a huge deal and
> mine is on a write-up and final warning.

(ECF No. 28-2 at 36:4–10.)  Wright also stated at that meeting that she was still trying

to process what happened with the department, where Lombard was given the

manager position, and that "maybe it didn't put me in a position where I was as open

and friendly as I could have been."  (ECF No. 28-2 at 54:20–24.)  She also stated, "But

I'm usually very friendly and open and willing to assist people.  And I was probably less

than that . . . .  I could have done that better."  (ECF No. 28-2 at 55:3–6.)

    4.    *Termination*

On January 8, 2018, Frank Archuleta became manager of the cath lab.  (ECF

No. 32 at 21 ¶ 91.)  Archuleta had a positive impression of Wright after their initial

meeting.  (ECF No. 32 at 21 ¶ 93.)  However, on January 10, 2018, Archuleta observed

West charging for an entire bottle of medicine, rather than the amount actually

administered.  (ECF No. 32 at 21–22 ¶ 97.)  West, Przymus, and Wright confirmed that

West was following the procedure that had been in place at the cath lab.  (ECF No. 32

at 22 ¶¶ 98–100.)  Archuleta concluded, however, that they were not telling the truth

about the previous practice; he reported the incident to HR but only specifically

complained about Wright (not West and Przymus).  (ECF No. 32 at 22 ¶¶ 102–03.)

On January 16, 2018, Archuleta met with Parrish to discuss concerns about

Wright.  Parrish recorded her notes from that meeting.  (ECF No. 28-35.)  Among other

12

things, Parrish's notes state:[9]

- Frank has concerns based on his interactions and observations that Stacey [Wright] is not going to help this department succeed.  He doesn't want her to undo all of the work that is going into turning this department around.

- Monday, 1/15: Dr. Grizbowsky - Stacey introduced Frank to Dr. G.  During the interaction Dr. Told Frank that "the one thing that you need to do is you have Stacey on your team" (paraphrasing).  She knows the operation.  You need to make sure she stays here."  Frank looked at Stacey and responded with - I'm hoping she is on my team, aren't we working together?"

- When discussing cath lab changes in operations or process Frank notices that comments are being made like "Stacey is not going to like that" from team members.

- Frank's comments: Stacey is smart and I wanted her to develop, sad thing is I don't think she wants to be here.  I like her as a person.  She is very experienced and knows what she is doing.  I'm just worried that she is not on board and will damage all of the work I am doing.

(ECF No. 28-25.)  According to Centura, Parrish accepted Archuleta's report as well founded.  (ECF No. 28 at 30 ¶ 31.)  Parrish felt that her experience with Wright corroborated Archuleta's concerns and made him the more credible witness compared with Wright, rendering it useless to discuss the report with Wright.  (ECF No. 28 at 30 ¶ 32.)

Thus, Parrish raised Archuleta's concerns with Davis and Folkenberg, and, according to Centura, the three decided that termination was the appropriate next step. (ECF No. 28 at 31 ¶¶ 33–34.)  Centura states that the basis for that determination was that a second manager in a row had expressed the perception that Wright was unsupportive.  (ECF No. 28 at 31 ¶ 35.)  Wright states that when Centura terminated her, she was told generally that "this is just not working" and "this is not a right fit."

_____

[9] The language in the bullet points is quoted from Parrish's notes.

(ECF No. 32 at 34; ECF No. 32-12 ¶ 15.)  She states she was never informed of Archuleta's alleged concerns.  (ECF No. 32 at 34; ECF No. 32-12 ¶ 16.)  The corporate representative refused to fully testify about the meeting in which the decision was made to terminate on the grounds that it was a privileged communication.  (ECF No. 32 at 25 ¶ 128.)

The next permanent nurse hired in the cath lab was Jason Ritz.  (ECF No. 32 at 25 ¶ 129.)  While Wright states Ritz was hired to replace her (ECF No. 32 at 25 ¶ 130), Centura states that a female traveler nurse, Kathleen Stewart, is the closest thing to a replacement for Wright's clinical role," and "the cath lab did not hire or promote any person to the charge nurse role" (ECF No. 43 at 15 ¶ 130).

## B.   Procedural History

On April 11, 2019, Wright filed her Complaint, bringing two claims: (1) sexual discrimination and harassment in violation of Title VII, 42 U.S.C. § 2000e-2(a); and (2) discrimination/retaliation for making charges, in violation of Title VII.[10]  (ECF No. 1.)  On

---

[10] The two claims in the Complaint assert somewhat confusing, overlapping allegations. First, Wright asserts sexual discrimination and harassment as grounds for her first claim.  She alleges she "experienced disparate treatment as a result of intentional discrimination on the part of Centura, in that it harassed her, treated her less favorably than her male colleagues, and terminated her based on false allegations."  (ECF No. 1 ¶ 82(b).)  Though this claim contains allegations of disparate treatment, harassment, and discriminatory discharge, it appears as though it is, at its core, a sex discrimination claim based on disparate treatment.  At no point in her response to the Motion does Wright make separate sexual harassment or other harassment based on gender arguments, so the Court treats this claim as one of sex discrimination, as both parties do throughout their briefing.

Second, Wright asserts discrimination/retaliation for making charges as grounds for her second claim.  She alleges she "complained of harassment and discrimination to which she was being subjected, both to Centura's 'Integrity Hotline,' and to Centura's Human Resources Department."  (*Id.* ¶ 89.)  Further, she alleges that "Centura's actions, including, but not limited to, issuing an unwarranted and fallacious final written warning against Ms. Wright, depriving Ms. Wright of the right to transfer to another Centura hospital, and terminating Ms. Wright's employment, were in retaliation for her complaints to HR and Centura's Integrity Hotline."  (*Id.* ¶

June 7, 2019, Centura filed its Answer.  (ECF No. 9.)

On March 25, 2020, Centura filed the Motion for Summary Judgment (ECF No. 28.)  On June 1, 2020, Wright responded.  (ECF No. 32.)  On July 5, 2020, Centura filed a reply.  (ECF No. 43.)  The Motion for Summary Judgment is ripe for review.

### III. ANALYSIS

**A.    Legal Framework**

"Under Title VII, it is 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'"  *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  Wright has not pointed to direct evidence of gender discrimination or retaliation.  Rather, she relies on circumstantial evidence to prove her claims.  (*See* ECF No. 32 at 25.)  Therefore, the Court views her claims through the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  *See Turner v. Pub. Serv. Co. of Colorado*, 563 F.3d 1136, 1142 (10th Cir. 2009).

Under *McDonnell Douglas*, Wright has the burden of initially establishing a *prima facie* case of gender discrimination, namely that: (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she was qualified for her

---

91.)  This claim repeats the allegation of discriminatory termination.  At bottom, this is a retaliation claim, based on a final written warning, denial of the right to transfer, and termination.

position, and (4) she was treated less favorably than others not in the protected class.[11]
*Id*.  To prevail on her Title VII retaliation claim, Wright must show: (1) that she engaged
in protected opposition to discrimination, (2) that a reasonable employee would have
found the challenged action materially adverse, and (3) that a causal connection exists
between the protected activity and the materially adverse action.  *Hansen v. SkyWest
Airlines*, 844 F.3d 914, 925 (10th Cir. 2016).[12]

 Once Wright establishes a *prima facie* case for each claim, the burden shifts to
Centura to provide a legitimate, nondiscriminatory basis for its adverse employment
action.  *Id*.  If Centura does so, the inference of discrimination drops out, and the
burden shifts to Wright to offer evidence showing that her protected status or activity
was a determinative factor in the employment action, or that Centura's
nondiscriminatory reason was merely pretext.  *Id.*  A claim of pretext need not be
supported with direct evidence, but may be based on "weaknesses, implausibilities,
inconsistencies, incoherencies, or contradictions" in the employer's claimed legitimate,
non-discriminatory reason such that a rational trier of fact could find the reason

---

[11] The parties dispute the applicable elements of a *prima facie* case of gender
discrimination.  Centura argues the Court should apply *Bird v. W. Valley City*, 832 F.3d 1188,
1200 (10th Cir. 2016), which provides that to establish a *prima facie* case of gender
discrimination, a plaintiff must demonstrate that "the adverse employment action occurred
'under circumstances which give rise to an inference of unlawful discrimination.'" (ECF No. 28
at 31.)  Wright argues the Court should apply the standard set forth in *Kendrick v. Penske
Transp. Servs. Inc.*, 220 F.3d 1220, 1229 (10th Cir. 2000), which provides that a plaintiff show
that she: (1) belonged to a protected class, (2) was qualified for her position, (3) was
discharged, and (4) her position was not eliminated after her discharge.  (ECF No. 32 at 26.)
 Because the Court will assume *arguendo* that Wright has met her *prima facie* burden, it
need not address the dispute regarding which standard applies.

[12] Wright does not utilize a direct evidence or "mixed motives" approach to prove her
retaliation claim, so the Court will not address this method of proving retaliation.  *See Hansen*,
844 F.3d at 925.

unworthy of belief.   *Turner*, 563 F.3d at 1143 (quotation marks and citation omitted).

**B.     Analysis**

Although Centura disputes that Wright has established a *prima facie* case of either discrimination or retaliation (ECF No. 28 at 31–35), because the Court has determined that it will resolve the Motion for Summary Judgment at the pretext stage of the *McDonnell Douglas* framework, the Court assumes *arguendo* that Wright has satisfied her *prima facie* burden on her discrimination and retaliation claims.

Centura underscores that the ultimate issue in this case is whether the decision-makers' decision to terminate Wright's employment was influenced by gender discrimination or illegal retaliation such that these "caused" Wright's termination under the applicable causation standards: "motivating factor" causation for discrimination and "but for" causation for retaliation.   (*Id.* at 35 n.9 (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).)   According to Centura, "there is simply no evidence that any of these three were influenced by anything other than an honest belief that Wright had not supported her managers."   (*Id.*)

Even taking all of Wright's arguments and proffered evidence into account, the Court agrees.   Wright has raised myriad arguments and disputed numerous facts—to no avail.   She has failed to demonstrate a genuine issue of material fact regarding the critical issue in this case: whether Centura engaged in unlawful discrimination and retaliation based on Wright's gender.   For the following reasons, the Court concludes it did not.

1.      *Legitimate, Nondiscriminatory Reasons for Centura's Actions*

In the Tenth Circuit, the burden to articulate legitimate, nondiscriminatory reasons for adverse actions is "exceedingly light," and a defendant must "merely proffer non-gender based reasons, not prove them." *Sprague v. Thorn Ams., Inc.*, 129 F.3d 1355, 1363 (10th Cir. 1997); *see also Bird* , 832 F.3d at 1201 (same and citing *Sprague*).

Centura's proffered legitimate, nondiscriminatory reasons for its actions against Wright pass muster.  The Final Written Warning essentially speaks for itself by listing at least three separate nondiscriminatory reasons (quoted above), supported by the record, mandating disciplinary action against Wright.  (ECF No. 28-33.)  Centura also argues the Final Written Warning is supported by Wright's admissions that she was "less than" "very friendly and open and willing" toward Lombard, and that she and the other cath lab members found it "hard to accept" when Lombard became the cath lab manager.  (ECF No. 28 at 36.)  Next, the decision-makers, Parrish, Davis, and Folkenberg, denied Wright's transfer because the Final Written Warning was "in the works," and once formally issued, would prohibit transfer under Centura's transfer policy.  (ECF No. 28 at 17.)  Finally, Centura states that the same three decision-makers terminated Wright after a second manager in a row announced his perception of Wright's lack of support.  (*Id.* at 35.)

2.    *Pretext*

Because Centura has met its burden to set forth legitimate, nondiscriminatory reasons for its actions, the burden thus shifts back to Wright to "to prove by a preponderance of the evidence that the legitimate reasons offered by" Centura "were

18

not its true reasons, but were a pretext for discrimination." *Herrera v. United Airlines, Inc.*, 754 F. App'x 684, 691 (10th Cir. 2018).  In doing so, Wright must show that Centura's "proffered non-discriminatory explanations for its actions are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [they are] unworthy of belief." *Bird*, 832 F.3d at 1201.  Under this approach, a plaintiff can establish pretext by "demonstrating that the employer treated the plaintiff differently from other similarly-situated employees who violated work rules of comparable seriousness." *Herrera*, 754 F. App'x at 692 (internal alterations and citation omitted). "Individuals are considered 'similarly-situated' when they (1) have dealt with the same supervisor; (2) were subjected to the same work standards; and (3) had engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1277 (10th Cir. 2005), *abrogated on other grounds by Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166 (10th Cir. 2018).

For her discrimination claim, Wright asserts three overarching theories of pretext: (1) Wright was disciplined for issues for which similarly situated men were not disciplined; (2) there were procedural irregularities in the discipline and termination of Wright; and (3) there were inconsistent explanations for the termination decision.  (ECF No. 32 at 29–34.)

For her retaliation claim, Wright asserts four overarching theories of pretext: (1) that Wright was denied a transfer, disciplined, and fired shortly after complaining of disparate treatment; (2) the reason for denying the transfer was false and did not

comply with Centura's written policies concerning transfers; (3) similarly situated employees were not disciplined for identical infractions and the discipline was procedurally irregular; and (4) the proffered reason for the termination was pretextual for the reasons set forth above.[13]   (*Id.* at 38–40.)

In assessing Centura's explanations for its actions, the Court examines "the facts as they appear *to the person making the decision*."  *Bird*, 832 F.3d at 1201 (emphasis in original, citation omitted).  The Court does "not ask whether the employer's proffered reasons were wise, fair or correct; we ask only whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs."  *Id.* (quoting *Debord v. Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642, 655 (10th Cir. 2013)).  Even a mistaken belief can be a legitimate, non-pretextual reason for an employment decision.  *See Cypert v. Indep. Sch. Dist. No. I-050 of Osage Cnty.*, 661 F.3d 477, 485 (10th Cir. 2011).

Moreover, "[d]ifferences in treatment that are trivial or accidental or explained by a nondiscriminatory motive will not sustain a claim of pretext."  *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000).  A plaintiff must therefore present enough evidence to permit a factfinder to conclude, based on a preponderance

---

[13] To the extent Wright argues that Centura's proffered reasons for its decision to issue a Final Written Warning and for its decision regarding termination are inadmissible, the Court finds her argument unavailing.  In her response, Wright argues that Centura's decision to issue the Final Written Warning and to terminate Wright's employment are inadmissible because these actions were discussed with one of Centura's Associate General Counsel, and Centura's Rule 30(b)(6) representative then asserted privilege with regard to those discussions.  (ECF No. 32 at 27–28, 37.)  However, as discussed in Centura's reply (ECF No. 43 at 15–16), the Court finds that Wright has been fully able to investigate the case and the reasons for the adverse employment actions against her, and thus, finds her argument is without merit.

of the evidence, that discrimination was *a determinative factor* in the employer's actions—simply disbelieving the employer is insufficient. *Lowe v. Indep. Sch. Dist. No. 1 of Logan Cnty., Okla.*, 2008 WL 4570472, at *3 (W.D. Okla. Oct. 9, 2008) (emphasis added), *rev'd and remanded on other grounds sub nom. Lowe v. Indep. Sch. Dist. No. 1 of Logan Cnty.*, 363 F. App'x 548 (10th Cir. 2010).  This Wright has failed to do.

Although Wright has raised numerous arguments and asserted various legal theories, her case is largely smoke and mirrors.  There is precious little evidence related to gender at all in this case, much less evidence of gender discrimination.  At its core, Wright's discrimination claim depends on Centura's alleged disparate treatment of her based on her gender.  As described in the Background section, Wright has argued that as the only permanent female employee in the cath lab, she was treated differently than her similarly situated male co-workers, West, Przymus, and during his tenure there, Voegle.[14]  Her examples of such disparate treatment include: being disciplined for running an errand during work hours, when her male colleagues were not; Lombard keeping a typed log of her interactions with Wright but not her male colleagues; and Archuleta's complaints to HR about Wright (but not her male colleagues) in connection with procedures for charging for medicine, and her negative attitude.  (ECF No. 32 at 29–31.)

None of these examples of alleged disparate treatment support a finding that Centura's actions were merely pretext for gender discrimination.  First, Wright's

_____

[14] Centura disputes that these men were similarly situated comparators to Wright, as she was the charge nurse and was perceived by Archuleta as the leading figure in the cath lab. (ECF No. 28 at 31–32.)  For the sake of this Order, the Court assumes these men were similarly situated comparators.

insubordination—rather than the fact that she was running errands at Walmart during work hours—led to the discipline based on that incident in the Final Written Warning.[15] Wright failed to clearly communicate with Lombard; the OR told Lombard no one qualified had assisted them that day; and on Wright's return from Walmart to the hospital, she spoke for at least thirty minutes with Watson, rather than immediately meeting with Lombard as she had requested.  The Final Written Warning explicitly states that, while *one* problem was that Wright did not ask leaders for permission to leave campus, several *other* issues connected to the incident warranted discipline, including Wright's willful disregard of her manager's request, not being there for the team, and not going directly to Lombard when she first returned to the hospital.  (ECF No. 28-33 at 1–2.)

Next, Wright highlights the distinction between Lombard's decision to keep a typed log of their interactions, when she did not similarly do so for the men in the cath lab.  (ECF No. 32 at 30.)  Despite the difference, a nondiscriminatory motive explains Lombard's actions.  Lombard states in her deposition that she kept notes of her conversations and a "summary of whoever [she] talked with even if it's just one sentence that was in my book," indicating she kept notes on male employees as well.

---

[15] Wright points out that when Lombard sent Gleason the proposed corrective action, Gleason wanted to confirm that they were not disciplining Wright for running errands if other were also engaged in the same behavior, *see supra* at 6.  (ECF No. 32 at 14, 36.)

While Wright makes much of this communication, highlighting it as evidence of disparate treatment based on gender, the Final Written Warning demonstrates that the main point of the discipline focused on her behavior toward her manager and failure to properly execute her duties and assist the OR when it requested help from the cath lab staff.  (ECF No. 28-33.)  Gleason's e-mail shows that Centura was aware of a possible issue if discipline was imposed on Wright but not her male colleagues based on running errands, but it does not demonstrate that Wright was disciplined because she ran errands.  To the contrary, her insubordinate behavior motivated the discipline.

(ECF No. 43-4 at 84:19–23; 87:3–6.)  However, "as conflicts began to arise" with Wright, Lombard was "more specific with [her] notes in [her] notebook and then [she] began to type them into . . . the computer."  *Id.*  The log itself, titled "Summary of Events," is dated "12/14/17," three days after the Walmart incident and several days before the date Wright received the Final Written Warning.  (ECF No. 43-13.)  Centura points out that the log shows signs of being edited for clarity for a formal disciplinary purpose, such as the awkward and unnatural clarification "I, Julie Lombard" after almost every first person pronoun, which would not have appeared in ordinary record-keeping. (ECF No. 43 at 6.)  Given Lombard's history of difficulties with Wright regarding obtaining training on data reports and the subsequent issues surrounding the Walmart errand incident, the nondiscriminatory reason of formally documenting interactions with a contentious employee explains Lombard's log, not gender discrimination.  Any distinction based on gender that Wright highlights is merely incidental.  *See Kendrick*, 220 F.3d at 1232 (trivial differences in treatment will not sustain a claim of pretext).

Like Lombard's log, Archuleta's complaints to HR about Wright are similarly explained by a nondiscriminatory motive and do not sustain a claim of pretext.  First, Wright admitted that she has no basis to believe that Archuleta discriminated against her on the basis of gender.  (ECF No. 28-15 at 215:25–216:3.)  Further, as Centura emphasizes, while there were common factors between Archuleta's perceptions of Wright, West, and Przymus, including dishonesty and a negative attitude, Archuleta had conversations with the men to address the perceived dishonesty.  (ECF No. 32-21 at 101:4–7.)  In addition, factors unique to Wright (described in Parrish's notes from her January 16, 2018 meeting with Archuleta) account for Archuleta's determination that

Wright was a particular threat to his ability to effect change in the cath lab, including: the other employees' resentment toward management originated with Wright; in expressing resistance to changes, the others referenced Wright's opinion; Archuleta overheard conversations related to Wright's HR issues; Wright tried to enlist Archuleta's help against Lombard and Parker to enable her to transfer; and Archuleta perceived Wright as having a lot of influence with the staff.  (ECF No. 43 at 24; ECF No. 32-22.)

According to Parrish, based on her recent experience with Wright and the Final Written Warning, the events described therein, and Wright's dispute of the Final Written Warning, Parrish felt that as a new person in the department, Archuleta was credible, and, in large part, she need not investigate his assertions as to Wright.  (ECF No. 43-5 at 258:24–259:8.)  He was the second manager in a row to express to HR that, based on several examples, Wright was not supporting him.  As such, Archuleta's views formed the basis for Wright's termination.  Wright has offered no evidence demonstrating that gender discrimination, not her failure to support management, motivated her termination.

As further evidence of pretext, Wright identifies what she characterizes as numerous "procedural irregularities" in Centura's actions, including: her termination; the investigation of Integrity Helpline and ADR complaints; the lack of an investigation into the issues raised by Archuleta; the decision to prevent transfer; the corrective action; and progressive discipline.  (ECF No. 32 at 31–34.)  In light of the Court's determination that the case lacks evidence of gender discrimination, the Court will not analyze Wright's claims regarding procedural irregularities in detail.  Centura has sufficiently explained in its reply why each perceived irregularity is, in fact, not irregular.  (*See* ECF

24

No. 43.)  Suffice it to say that in the absence of evidence of gender discrimination, the Court will not "act as a super personnel department" or second-guess Centura's good-faith business judgments.  *Turner*, 563 F.3d at 1144.

Wright's arguments regarding Centura's purportedly changing reasons for termination being pretext for discrimination are similarly without merit.  (ECF No. 32 at 34.)  At the time she was terminated, Wright was told that "this is just not working" and "this is not a right fit."  (ECF No. 32-12 ¶ 15.)  Wright states that no one informed her of Archuleta's concerns.  (ECF No. 32-12 ¶ 16.)  As a result, Wright contends that Centura's explanation for its decision to terminate her in this litigation is inconsistent with what she was told when terminated.  However, the Court finds that the explanation is not inconsistent.  Rather, in response to Wright's assertions of unlawful gender discrimination and retaliation, Centura has expounded on its reasons, specifying its precise basis for terminating Wright.  Rather than being inconsistent with Centura's reason for terminating Wright, Archuleta's concerns, as expressed in his deposition and in Parrish's notes regarding their meeting, support the explanation provided to Wright when she was terminated.

Without underpinning evidence of gender discrimination, all of the adverse actions cited in the retaliation claim have clear nondiscriminatory motives, and therefore, for the following reasons, Centura is entitled to summary judgment on the retaliation claim.  First, the Final Written Warning described at least three instances of Wright's insubordinate conduct supporting disciplinary action.  Next, the Final Written Warning was "in the works" at the time Wright was denied permission to transfer, so even though she did not *technically* have a corrective action on her record in the last six

months when she applied to transfer, the evidence shows she *would* have such discipline on her file shortly thereafter; further, Wright has not provided other evidence suggesting the denial of transfer was retaliatory.  Finally, Parrish, Davis, and Folkenberg terminated Wright based on two successive managers reporting that she was unsupportive.  As explained above, these are all well-supported, nondiscriminatory reasons for the three adverse employment actions.  The actions were not, as Wright asserts, pretext for retaliation in response to her complaints to the Integrity Helpline or her ADR complaint.

When the Court takes a step back and considers the case in its entirety, the lack of any other circumstantial evidence pointing to gender discrimination bolsters the Court's conclusion that Wright has failed to demonstrate that a genuine issue of material fact exists which precludes summary judgment.  Wright identifies no comments by anyone regarding her gender.  All of the persons mentioned in Wright's Integrity Helpline call as treating her unfairly, namely Lombard, Parrish, and Parker, are female. (ECF No. 28-18.)  *See Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005) (plaintiff not entitled to inference of discrimination where allegedly discriminatory supervisor was a member of the same protected class—women— as plaintiff).  Wright testified that she had no reason to believe Archuleta discriminated against her based on her gender.  (ECF No. 28-15 at 215:25–216:3.)  And, importantly, it was Archuleta's independent complaints to HR which led to Wright's termination.  When asked if she had any reason to believe that Lombard, Parker, Parrish, or Pontius treated men more favorably than women, the only reason Wright could state was her own "personal experience."  (ECF No. 28-15 at 214:3–22.)

26

This theme continues as to all three decision-makers.  Wright denied believing Parrish treated men better than women.  (ECF No. 28-15 at 213:20–214:9.)  Wright testified she had no idea what Davis's motivation for any actions she had taken was.  (ECF No. 28-15 at 216:24–217:25.)  Finally, when asked whether she had a basis to believe that Folkenberg has taken actions or is motivated by gender bias, Wright equivocated, stating, "Yeah, that's not – I – I don't know anything about that, no."  (ECF No. 28-15 at 216:4–18.)

Because Wright has not shown evidence of disparate treatment based on gender or evidence that Centura's explanations for its actions against her are pretextual, her discrimination and retaliation claims fail.  Centura is, therefore, entitled to summary judgment on both claims.

## V. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.   Defendant's Motion for Summary Judgment (ECF No. 28) is GRANTED;

2.   Plaintiff's claims are DISMISSED with prejudice;

3.   Plaintiff's Unopposed Motion to Continue Final Trial Preparation Conference (ECF No. 53) is DENIED AS MOOT;

4.   Judgment shall enter in favor of Defendant and against Plaintiff, and Defendant shall have its costs upon compliance with D.C.COLO.LCivR 54.1; and

5.   The Clerk shall terminate this action.

Dated this 13th day of January, 2021.

BY THE COURT:

William J. Martínez
United States District Judge
